UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMILY W.[1],

Plaintiff, Civil Action No. 25-11179

v. David R. Grand
United States Magistrate Judge[2]

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.
_______________________________/

**OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 18)**

Plaintiff Emily W. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions. (ECF Nos. 14, 18).

For the reasons set forth below, the Court finds that the ALJ's conclusion that Plaintiff is not disabled under the Act is not supported by substantial evidence. Thus, the Commissioner's Motion for Summary Judgment **(ECF No. 18)** will be **DENIED**; Plaintiff's Motion for Summary Judgment **(ECF No. 14)** will be **GRANTED**; and this case

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The parties have consented to the undersigned exercising jurisdiction over all proceedings in this civil action pursuant to 28 U.S.C. § 636(c). (ECF No. 6).

will be **REMANDED** to the Commissioner for further proceedings consistent with this Opinion and Order.

### A. Background

Plaintiff was 27 years old at the time of her alleged onset date of July 28, 2021, and at 5'5" tall weighed approximately 210 pounds. (PageID.76, 244).[3] She completed high school but had no further education. (PageID.245). She previously worked as a production manager, caregiver, and, most recently, as a heavy equipment operator. (PageID.51, 85, 245). She was laid off in November of 2020 "for the end of road construction season"; subsequently, however, she was diagnosed first with breast cancer in April 2021, and then with multiple sclerosis ("MS") in July 2021, at which point she contends she could no longer work because of her physical impairments. (PageID.53-54, 244). She now alleges disability primarily as a result of these two conditions, as well as optic neuritis, depression, and anxiety. (PageID.50, 62-64, 76, 99, 244, 261).

After Plaintiff's applications for DIB and SSI were denied at the initial level on March 27, 2023 (PageID.121-28), and on reconsideration on July 11, 2023 (PageID.136-41), she timely requested an administrative hearing, which was held on January 18, 2024, before ALJ Elias Xenos (PageID.47-74). Plaintiff, who was represented by attorney Michael Korby, testified at the hearing, as did vocational expert ("VE") Eric Dennison. (*Id.*). On March 7, 2024, the ALJ issued a written decision finding that Plaintiff is not disabled under the Act. (PageID.29-41). On February 20, 2025, the Appeals Council

[3] Standalone citations to "PageID.___" are all to the administrative transcript in this case, which can be found at ECF No. 4-1.

denied review. (PageID.15-19). Plaintiff timely filed for judicial review of the final decision on April 24, 2025. (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Plaintiff's medical record, disability reports, and testimony as to her conditions and resulting limitations. Instead of summarizing that information here, the Court will cite to the transcript as necessary in its discussion of the parties' arguments.

**B. The ALJ's Application of the Disability Framework Analysis**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(A)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively

> presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff is not disabled under the Act. At Step One, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of July 28, 2021. (PageID.32). At Step Two, the ALJ found that she has the severe impairments of MS, breast cancer, obesity, migraine headaches, major depressive disorder, and anxiety. (*Id.*). At Step Three, the ALJ found that Plaintiff's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (*Id.*).

The ALJ then assessed Plaintiff's RFC, concluding that she is capable of performing light work, with the following additional limitations: can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds; can occasionally balance on narrow,

slippery, or erratically moving surfaces, stoop, crouch, crawl, and kneel; can never reach overhead bilaterally; can frequently handle, finger, and feel bilaterally; can never work around unprotected heights or hazardous machinery; must avoid concentrated exposure to temperature extremes, wetness, humidity, or vibration; must work indoors, in an environment free of atmospheric conditions; must be permitted to sit for 10-15 minutes after standing continuously for one hour throughout the workday; is limited to simple, routine tasks, in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, with few, if any, workplace changes; and would be off-task 10% of the workday over and above normally scheduled breaks. (PageID.34-35).

At Step Four, the ALJ found that Plaintiff is unable to perform any of her past relevant work. (PageID.39). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Plaintiff is capable of performing the light jobs of food and beverage order clerk (14,000 jobs in the national economy), ink printer (16,000 jobs), and hand mounter (7,500 jobs). (PageID.40). As a result, the ALJ concluded that Plaintiff is not disabled under the Act. (PageID.41).

**C. Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). The

phrase "substantial evidence" is a "term of art …." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id*. (internal citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla.'" *Id.* (internal citations omitted). Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health &*

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**D. Analysis**

As set forth above, the ALJ found that Plaintiff has MS, breast cancer, obesity, migraine headaches, major depressive disorder, and anxiety. (PageID.32). The ALJ then assessed Plaintiff's RFC, limiting her to light work, with several additional physical and mental limitations. (PageID.34-35). Before this Court, Plaintiff argues that the ALJ's Step Five finding – that there are a substantial number of jobs in the national economy that she can perform – is not supported by substantial evidence.[4] (ECF No. 14, PageID.973-78). For the reasons set forth below, the Court agrees.

*1. The Relevant Medical Evidence*

Because the legal issue at hand is largely unrelated to the medical and other evidence of record, the Court will not discuss that evidence in great detail. For background purposes, however, Plaintiff had an abnormal mammogram on March 26, 2021; she underwent a biopsy of her left breast on April 19, 2021, which revealed malignancy; and she underwent a bilateral mastectomy on August 4, 2021. (PageID.374). Surgical pathology confirmed high grade ductal carcinoma. (PageID.381). Plaintiff underwent a Diep flap reconstruction procedure in October 2022 after developing bilateral expander infection. (PageID.773-74). In December 2022, she underwent revision bilateral reconstruction surgery.

In between the time she was diagnosed with breast cancer (in April 2021) and the

[4] Plaintiff also argues that the ALJ erred in evaluating her subjective complaints, and that, as a result, the ALJ's RFC finding is not supported by substantial evidence. (ECF No. 14, PageID.967-73). Because the Court is remanding on other grounds, it need not address this argument in detail. On remand, however, the ALJ should give full and fair consideration to this issue.

time she underwent a bilateral mastectomy (in August 2021), Plaintiff woke up one morning in July 2021 with a headache and distorted vision in her right eye. (PageID.437). She took Tylenol and rested, but when her symptoms did not improve the next day, she went to urgent care, who referred her to an emergency ophthalmologist. (*Id.*). That exam was concerning enough that Plaintiff was sent to the emergency room at Henry Ford Hospital for a brain MRI. (*Id.*). The MRI showed enhancement of the right optic nerve and multiple periventricular lesions. (*Id.*). Subsequently, Plaintiff underwent a lumbar puncture (PageID.442), which was remarkable to 10 oligoclonal bands unique to cerebrospinal fluid and elevated IgG index (PageID.36). She was diagnosed with MS.

At a follow-up visit to neurologist Boyd Koffman, MD in September 2021, Plaintiff reported forgetfulness, fatigue, and numbness in both arms, although she denied any incontinence or gait difficulties. (PageID.363). She was prescribed Copaxone to treat her symptoms. (PageID.367-68). She lost vision in her right eye again in November 2021, which lasted for several weeks even after a steroid infusion. (PageID.333). Eventually, her symptoms resolved, although she had persistent pressure in the eye. (*Id.*).

Plaintiff returned to see Dr. Koffman on December 9, 2021, at which time she reported headaches, anxiety, photophobia and eye pain, forgetfulness, fatigue, numbness in her right leg, and depth perception difficulty (particularly when driving). (PageID.342-43). She was continued on Copaxone and advised to return in six months. (PageID.349-50). In the interim, however, Plaintiff called Dr. Koffman's office with complaints of migraine headaches during her MS flares, and she was prescribed Imitrex. (PageID.338-39). At a follow-up visit to Dr. Koffman on March 10, 2022, she indicated she was having

migraines 2-3 times a week, and that Imitrex helped about half of the time. (PageID.332). Verapmil was added for migraine prevention, and Plaintiff was advised to obtain a repeat brain MRI before her next visit. (PageID.337).

On August 9, 2022, Plaintiff saw Dr. Koffman, reporting that she had not been taking Copaxone, both because she had lost insurance coverage and because the side effects had become intolerable. (PageID.806, 847). Vumerity was prescribed instead, although Plaintiff was unable to begin taking it until December 2022 due to insurance approval issues. (PageID.793, 807, 847). In the meantime, Plaintiff obtained an updated MRI on August 23, 2022, which showed findings consistent with active demyelination, with multiple new lesions, some of which were enhancing. (PageID.831).

At her next neurology visit in February 2023, Plaintiff reported that her fatigue had improved somewhat, but she still had forgetfulness and intermittent tingling in her bilateral fingers and toes. (PageID.847). She needed IV steroids in January 2023 for a MS flare. (*Id.*). At her August 2023 neurology visit, Plaintiff reported appetite change, fatigue, photophobia, eye pain, visual disturbance, diarrhea and nausea, cold and heat intolerance, urinary frequency and urgency (including two episodes of urinary incontinence), gait problems, joint swelling (burning), myalgias, speech difficulties, headaches, decreased concentration, sleep disturbance, and anxiety. (PageID.906-08). She was continued on Vumerity and Imitrex, and gabapentin was added. (PageID.912).

*2. The ALJ's Reliance on the VE's Testimony is Not Supported by Substantial Evidence*

As set forth above, the ALJ analyzed the medical and other evidence of record and

concluded that Plaintiff's has the RFC to perform light work, with several additional physical and mental limitations. (PageID.34-35). In determining at Step Five of the sequential analysis that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, the ALJ specifically indicated that he was relying on the VE's testimony that she can perform the jobs of food and beverage order clerk, ink printer, and hand mounter. (PageID.40). Plaintiff now argues that the ALJ's Step Five finding is not supported by substantial evidence because there is a conflict between the adjudicated RFC and the VE's testimony regarding an employer's tolerance of time off-task. (ECF No. 14, PageID.973-78). For the reasons set forth below, the Court agrees that the ALJ's Step Five finding is not supported by substantial evidence.

At Step Five, the Commissioner bears the burden of demonstrating there are a significant number of jobs in the national economy that accommodate the claimant's RFC. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner commonly satisfies this burden through testimony of a VE who identifies specific occupations offering a significant number of jobs in the national economy that a hypothetical individual with the claimant's RFC and vocational profile could perform. *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606-07 (6th Cir. 2009). However, a VE's testimony concerning the availability of suitable work may constitute substantial evidence only where the testimony is elicited in response to a hypothetical question that accurately sets forth the claimant's limitations. *See Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001); *see also Megan H. v. Saul*, No. DLB-19-1320, 2020 WL 7338080, at *2 (D. Md. Dec. 14, 2020) ("[T]he accuracy and legibility of the hypothetical to the VE play an important role

in the disability determination process, particularly where, as here, the ALJ relies on the VE's testimony as substantial evidence for his step-five conclusion that a claimant is not disabled[.]"). Ambiguous testimony by a VE can prevent the substantial evidence standard from being met at Step Five of the disability determination process. *See Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019).

In this case, the ALJ adopted an RFC with a very precise 10% off-task restriction. (PageID.35). Specifically, the ALJ concluded that, "[d]ue to a combination of severe mental and neurological deficits, work is limited to simple, routine tasks, in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, with few, if any, workplace changes; and [Plaintiff] ***would be off-task 10% of the workday over and above normally scheduled breaks***." (*Id.*) (emphasis added). Thus, in assessing Plaintiff's RFC, the ALJ expressly fixed the off-task limitation at ***exactly 10%*** – not "up to" 10%, "no more than" 10%, or some other variable manner; in other words, under the RFC Plaintiff could perform jobs that permitted her, say, 8% additional off-task time, but if a job would not permit her 10% additional off-task time, she would not be able to perform it. Moreover, the 10% limitation included in the RFC would apply to each workday, with no day-to-day or week-to-week variability in "off-task" time; in other words, Plaintiff could perform jobs that permitted her, say, 8% additional off-task time each day, but if the job only permitted that much additional off-task time a few days each work week, she would not be able to perform it.

The ALJ then relied on the VE's testimony in response to hypothetical questions to conclude that an individual with Plaintiff's age, education, work experience, and RFC

would be able to perform the jobs of food and beverage order clerk, ink printer, and hand mounter. (PageID.40). The problem, however, is that a close reading of the VE's testimony reveals that – at worst – it fails to support the ALJ's conclusion, or – at best – it is so ambiguous as to require clarification.

Specifically, at the hearing, the ALJ first posed a hypothetical question consistent with the RFC that was ultimately adopted, including the limitation that the individual would require the ability to sit for 10-15 minutes after standing for one hour and that the hypothetical individual would be "off task 10 percent of the workday over and above normally scheduled breaks." (PageID.68). In response, the VE testified that while there were positions "where the person would be able to switch positions standing and sitting throughout the workday at varying times, there would be … no guarantee that the person would be able to sit for 10 to 15 minutes after standing for an hour, and then to be able to resume standing." (PageID.68-69). The ALJ then continued, with the following exchange occurring:

> VE: …. ***And then the off-task rate, while 10 percent is tolerated, it's not something that the employer would want to see on a regular and consistent basis without some level of improvement throughout the workweek.***
>
> ALJ: Uh-huh.
>
> VE: ***Certainly the be-off-task rate would somewhat – maybe a Wednesday or a Thursday be less than that or something to that affect (sic)….***

(PageID.69) (emphasis added). The VE ultimately stated that, based on these two limitations (sit-stand and time off-task) as posed, there were no jobs he could identify in

response to the ALJ's hypothetical. (*Id.*). Indeed, during the course of the ongoing exchange between the ALJ and the VE – during which jobs at both the light and sedentary levels were discussed – the VE twice made clear that the "continuous 10 percent off task every day" limitation was problematic because "employers would want to see an improvement on [it] throughout the workweek." (*Id.*).

At this point, the ALJ appeared unsatisfied with the VE's response, and the following colloquy transpired:

> ALJ: Well, I know – I don't want to split hairs about this, and I know it varies employer by employee (sic). You know, I don't know if 9 percent, 10 percent, 11 percent. Surely there's some amount of off task that would be tolerated in unskilled work, even if it's on a daily basis, no?
>
> VE: There would be. ***Typically, it is up to 10 percent.*** And the reason I say ***up to*** is most employers I've talked to –
>
> ALJ: Well, that's what I mean. I mean, and again, I know, I mean, I don't want anyone to split hairs here. But let's say that it is consistently – let's say 10 percent, but not more than 10 percent. My next hypothetical to you will be at 20 percent, and I don't want to split hairs between 10 and 20. But for purposes of this hypothetical, let's just assume it is 10 percent.
>
> VE: All right. Thank you for that, then. I do go with ***up to 10 percent tolerated***, so … I can identify sedentary positions for you sir.

(PageID.69-70) (emphasis added). It is after this exchange, with somewhat contradictory testimony that is not fully developed, that the VE identifies the three jobs that would later be relied upon by the ALJ to deny Plaintiff's claim for benefits. (PageID.40, 69-70).

In her motion, Plaintiff argues that that "the VE identified ten percent (10%) as the vocational breakpoint." (ECF No. 14, PageID.976). In other words, Plaintiff maintains

that being "[o]ff-task 'up to' that amount is tolerated; at 10%, on a consistent daily basis employment is precluded." (*Id.*). The Court agrees with Plaintiff's interpretation of the VE's testimony; indeed, he testified twice, very specifically, that employers would not tolerate the exact off-task limitation included in Plaintiff's RFC – namely, an individual who is off-task 10% of each workday over and above normally scheduled breaks. (PageID.69 ("while 10 percent is tolerated, it's not something that the employer would want to see on a regular and consistent basis without some level of improvement throughout the workweek" and "continuous 10 percent off task every day" limitation is problematic because "employers would want to see an improvement on [it] throughout the workweek")). Thus, it appears there is an inconsistency between the ALJ's RFC finding that Plaintiff would be off-task 10% of each workday and a conclusion that jobs exist that Plaintiff can perform, given the VE's testimony that consistent lack of improvement in 10% time off-task over the course of a workweek is work-preclusive.

The Commissioner attempts to bolster the VE's testimony by pointing to the following exchange, which took place during cross-examination of the VE:

> Q: All right. And I know you talked some about time off task. Is there any difference in your opinion, if the hypothetical individual would need extra breaks? Or I guess, at what level of needing extra breaks above normal breaks would be work preclusive in your opinion?
>
> VE: Anything that would be above 10 percent on a regular and consistent basis would be work preclusive in my opinion, sir.

(PageID.72-73).

The Commissioner argues that, according to this questioning, "the VE believed that

a hypothetical individual who was off task ten percent of the day could perform work." (ECF No. 18, PageID.997). Accordingly, the Commissioner maintains that such testimony is consistent with Plaintiff's RFC and, thus, the ALJ reasonably relied on this testimony at Step Five to find that Plaintiff is capable of performing a significant number of jobs in the national economy. (*Id.*). The Court disagrees. The gist of the question posed involved the need for "extra breaks" – *i.e.*, breaks above and beyond normal breaks. When responding to this question, the VE indicated that "anything that would be above 10 percent ***on a regular and consistent basis*** would be work preclusive[.]" (PageID.72-73) (emphasis added). The Court finds the testimony sufficiently ambiguous such that it cannot say it provides substantial evidence in support of the ALJ's Step Five finding.

Merely saying that taking "extra breaks" "above 10 percent on a regular and consistent basis would be work preclusive" does not necessarily mean that being "off-task" 10% of each workday in addition to taking "normally scheduled breaks" would not be work preclusive. It is not clear that "extra breaks" and "off-task" time are the same thing. More fundamentally, and as noted above, the VE testified unequivocally on at least two occasions that employers would not tolerate the exact off-task limitation included in Plaintiff's RFC – namely, an individual who is off-task 10% of each workday over and above normally scheduled breaks on a regular basis. Thus, the ALJ's Step Five finding that Plaintiff can perform the jobs of food and beverage order clerk, ink printer, and hand mounter is not supported by substantial evidence.

Moreover, even if the Court reads the VE's testimony on cross-examination indulgently, that testimony is – at most – ambiguous, and the ALJ did not make any attempt

to explore or resolve the ambiguity.[5] As one court succinctly stated, "[w]hen internal conflict and ambiguity in the VE's testimony make[s] it unclear whether [a claimant] was employable or not, the ALJ should resolve that conflict." *Barry C. S. v. Kijakazi*, 625 F. Supp. 3d 1342, 1352 (N.D. Ga. 2022) (internal quotations omitted; brackets in original). "If the ALJ does not erase the ambiguity contained in the VE's testimony, it may be necessary for the Court to remand the case to further develop the record." *Id.* (internal quotations omitted).

In similar cases, courts have remanded due to an ALJ's failure to identify and resolve internal inconsistencies in a VE's testimony that remained largely irreconcilable absent further explanation. *See, e.g., Vail v. Dudek*, No. 4:24-CV-1873, 2025 WL 1311916, at *6 (M.D. Pa. May 6, 2025) ("remand is necessary if there are material ambiguities in the Vocational Expert's testimony that are not adequately addressed and resolved by the ALJ") (citing cases); *Kimbra L. v. Acting Comm'r of Soc. Sec.*, No. 3:20-cv-6192-RSM, 2021 WL 3088713, at *4 (W.D. Wash. July 22, 2021) ("[T]he VE testified that ... an employer can typically tolerate one [absence] per month or one [absence] every other month without termination of employment. This response is inconsistent with the previous unequivocal testimony by the VE that one with absenteeism of one time per month could maintain competitive employment in the three identified jobs.... Indeed, this portion of the VE's testimony clearly indicates that some employers will not tolerate the

[5] When the VE attempted to explain why he would say "up to" 10% off-task, as opposed to simply 10% off-task, the ALJ interrupted, effectively shutting down the VE's explanation as to why a consistent, everyday 10% off-task limitation would be work preclusive. (PageID.70).

absenteeism the ALJ found that plaintiff suffered from as reflected in plaintiff's RFC. The Court therefore finds persuasive plaintiff's argument that the VE did not provide job numbers for how many of the jobs she named would accept one day a month of absenteeism and how many would not[.] ... *The ALJ's reliance on one portion of the VE testimony, while ignoring th[e] other portion, provided minutes later, is not such relevant evidence as a reasonable mind might accept as adequate to support a conclusion*.") (emphasis added; internal citations and quotations omitted); *Michael D. v. Comm'r of Soc. Sec.*, No. 3:19-cv-5137-RBL-TLF, 2020 WL 10088719, at *2 (W.D. Wash. Feb. 19, 2020) ("[T]he VE's testimony was internally inconsistent: it does not make logical sense that plaintiff would maintain the ability to perform this job if he was limited to standing for anywhere from two to four hours, yet also lack the ability to perform the same job if he was limited to standing for only two hours…. As a result, the ALJ lacked a substantial evidentiary basis for finding that plaintiff could perform his past work ....").

In sum, the relevant part of Plaintiff's RFC provides that she "would be off-task 10% of the workday over and above normally scheduled breaks." (PageID.35). The VE did not testify that employers would tolerate an employee being off task 10% of every workday; rather, he explained that employer tolerance depends on improvement over the course of a workweek and that consistent, daily off-task behavior at the 10% level is generally not accepted. (PageID.68-69). The ALJ did not clarify the VE's testimony or reconcile the inconsistency between that testimony and his Step Five finding. For all of these reasons, the Court cannot conclude that the VE's testimony in response to the ALJ's hypothetical questions constitutes substantial evidence in support of the ALJ's Step Five

finding or his overall determination that Plaintiff is not disabled. As such, remand is required.

**E. Conclusion**

For the foregoing reasons, the Court **DENIES** the Commissioner's Motion for Summary Judgment **(ECF No. 18)**; **GRANTS** Plaintiff's Motion for Summary Judgment **(ECF No. 14)**; and, pursuant to sentence four of 42 U.S.C. § 405(g), **REMANDS** this case to the ALJ for further proceedings consistent with this Opinion and Order.

**IT IS SO ORDERED.**

Dated: September 29, 2026
Ann Arbor, Michigan

s/David R. Grand
DAVID R. GRAND
United States Magistrate Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 29, 2026.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager